## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02565-GPG-MEH
    *(Consolidated with 23-cv-02592-GPG-MEH; 23-cv-02713-GPG-MEH; and 23-cv-2730)*

DAVID LIPPS, *et al*, individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

LCS FINANCIAL SERVICES CORPORATION,

        Defendant.

---

### CONSOLIDATED CLASS ACTION COMPLAINT

---

Plaintiffs David Lipps, Brandie Stifel, Michael Weiler, and Larry Vaught (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against LCS Financial Services Corporation ("LCS" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs bring this class action against LCS for its failure to properly secure and safeguard Plaintiffs' and other similarly situated LCS customers' full names and Social Security numbers (the "Private Information") from hackers.

2.    LCS is a full-service debt collection agency based in Colorado that provides debt recovery services to financial institutions throughout the United States.

3.     On or about September 26, 2023, LCS filed official notice of a hacking incident with the Office of the Texas Attorney General.[1]

4.     LCS also sent out data breach notice letters (the "Notice") to individuals whose information was compromised as a result of the hacking incident, with the first Notices being sent out on or around September 22, 2023.

5.     Based on the Notice sent by the company, LCS detected unusual activity on some of its computer systems on February 25, 2023. In response, LCS launched an investigation which revealed that an unauthorized party had access to certain company files on or about February 24, 2023 (the "Data Breach"). Yet, LCS waited nearly *seven months* to notify the public that they were at risk.

6.     As a result of this delayed response, Plaintiffs and Class Members (defined below) had no idea for seven months that their Private Information had been impacted by the Data Breach, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. This risk will remain for their respective lifetimes.

7.     Armed with the Private Information accessed in the Data Breach, (and a head start) data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and obtaining driver's licenses in Class Members' names but with another person's photograph.

---

[1] *See* https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Jan. 8, 2024).

8.      There has been no assurance offered by LCS that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

9.      Therefore, Plaintiffs and Class Members have suffered, and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

10.     Plaintiffs bring this class action lawsuit to address LCS's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiffs and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

11.     The potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to LCS, and thus LCS was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

12.     Upon information and belief, LCS failed to properly monitor and implement security practices regarding the computer network and systems that housed the Private Information that, if implemented, could have prevented the Data Breach from occurring.

13.     Plaintiffs' and Class Members' identities are now at risk because of LCS's negligent conduct as the Private Information that LCS collected and maintained is now in the hands of data thieves and other unauthorized third parties.

14.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and compromised during the Data Breach.

15.     Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for negligence, negligence *per se*, breach of confidence, breach of third-party beneficiary contract, invasion of privacy, unjust enrichment/quasi-contract, and declaratory judgment.

## II.    PARTIES

16.     Plaintiff David Lipps is, and at all times mentioned herein was, an individual citizen of the State of Florida.

17.     Plaintiff Brandie Stifel is, and at all times mentioned herein was, an individual citizen of the State of Iowa.

18.     Plaintiff Michael Weiler is, and at all times mentioned herein was, an individual citizen of the State of Vermont.

19.     Plaintiff Larry Vaught is, and at all times mentioned herein was, an individual citizen of the State of Texas.

20.     Defendant LCS is a debt collection agency operating under the laws of the State of Colorado with its principal place of business at 6782 S. Potomac Street, Suite 100, Englewood, Colorado, 80112 in Arapahoe County.

## III.    JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of Class Members is over 100, many

of whom, including Plaintiffs, have different citizenship from LCS. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

22.     This Court has jurisdiction over LCS because LCS operates in and is incorporated in this District.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and LCS has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A.  LCS's Business and Collection of Plaintiffs' and Class Members' Private Information

24.     LCS is a full-service debt collection agency specializing in bankruptcy, compliance and audits, and loan recovery. Founded in 2005, LCS maximizes debt recoveries for financial institutions nationwide, including credit unions and a variety of mortgage, automotive, and student loan lenders. Upon information and belief, LCS employs more than 50 people, maintains a license in all 50 states, and generates approximately $27 million in annual revenue.

25.     As a condition of receiving financial services, LCS requires that its clients entrust it with highly sensitive personal information belonging to individuals connected to its clients. In the ordinary course of receiving service from LCS, Class Members, directly or indirectly, were required to provide their Private Information to Defendant.

26.     In its privacy policy, LCS states "[w]e recognize that when you choose to disclose information about yourself, you trust LCS Financial to act in a responsible manner."[2] LCS also

---

[2] *See* https://lcsfin.com/privacy/ (last visited Jan. 8, 2024).

represents that it is "dedicated to protecting [Plaintiffs' and Class Members'] Personally Identifiable Information, and will make every reasonable effort to keep that information secure." *Id.* However, it failed to do so.

27.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, LCS assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

**B.   The Data Breach and LCS's Inadequate Notice to Plaintiffs and Class Members**

28.     Through the Data Breach, unauthorized cybercriminal(s) accessed a cache of highly sensitive and confidential Private Information, including Plaintiffs' and Class Members' Social Security numbers.

29.     On or about September 22, 2023, roughly *seven months* after LCS learned that the Class's Private Information was first accessed by cybercriminals, LCS finally began to notify individuals that its investigation determined that their Private Information was impacted.

30.     LCS had obligations created by the Gramm-Leach-Bliley Act, the Consumer Financial Protection Act, the FTC Act, contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

31.     Class Members, directly or indirectly, provided their Private Information to LCS with the reasonable expectation and mutual understanding that LCS would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

32.    LCS's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

33.    LCS knew or should have known that its electronic records would be targeted by cybercriminals.

**C.    <u>Data Breaches are Preventable</u>**

34.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

35.    To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a

---

[3] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Jan. 8, 2024).

need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

36.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets, through the following:**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

---

[4] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts, through the following:**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions, through the following:**

- Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely;

**Build credential hygiene, through the following:**

- Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege, through the following:**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure, through the following:**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications.[5]

37.    Given that Defendant was storing the sensitive PII of its clients' customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[5] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Jan. 8, 2024).

38.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of, upon information and belief, thousands of consumers, including that of Plaintiff and Class Members.

**D.  <u>LCS Failed to comply with Laws and Regulations Governing Data Security for Sensitive Consumer Financial Information</u>**

39.     The Gramm-Leach-Bliley Act ("GLBA") requires financial institutions, including debt collectors like Defendant, to safeguard sensitive consumer data. The Federal Trade Commission ("FTC") has promulgated Safeguard Rules under the GLBA that require financial institutions, including debt collectors like Defendant, to develop, implement, and maintain an information security program with administrative, technical, and physical safeguards to protect customer information.

40.     In August 2022, the Consumer Finance Protection Bureau (CFPB) published a circular on data security, affirming the importance of the matter and the applicability of the GLBA. The CFPB also noted that "[w]idespread data breaches and cyberattacks have resulted in significant harms to individuals, including monetary loss, identity theft, significant time and money spent dealing with the impacts of the breach, and other forms of financial distress," and the circular concluded that the provision of insufficient security for individuals' data can violate the prohibition on "unfair acts or practices" in the Consumer Finance Protection Act ("CFPA").[6]

---

[6] CONSUMER FIN. PROT. BUREAU, *Consumer Financial Protection Circular 2022-04: Insufficient data protection or security for sensitive consumer information* (Aug. 11, 2022), https://files.consumerfinance.gov/f/documents/cfpb_2022-04_circular_2022-08.pdf.

41. The FTC has also promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

42. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

43. The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

44.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

45.     As evidenced by the Data Breach, LCS failed to properly implement basic data security practices. LCS's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes a violation of the GLBA as well as an unfair act or practice prohibited by the CFPA and Section 5 of the FTCA.

46.     LCS was, at all times, fully aware of its obligation to protect the Private Information of its clients' customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E.  LCS Failed to Comply with Industry Standards**

47.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

48.     Some industry best practices that should be implemented by businesses like LCS include but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As

evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

49.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

50.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

51.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**F.  LCS Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information**

52.     In addition to its obligations under federal and state laws, LCS owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. LCS owed a duty to Plaintiffs and Class Members to provide reasonable security, including complying with industry

standards and requirements, training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

53. LCS breached its obligations to Plaintiffs and Class Members and was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. LCS's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.   Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.   Failing to adequately protect its clients' Private Information;

    c.   Failing to properly monitor its own data security systems for existing intrusions;

    d.   Failing to sufficiently train its employees regarding the proper handling of its clients' Private Information;

    e.   Failing to comply with obligations imposed by the GLBA;

    f.   Failing to fully comply with CFPB and FTC guidelines for cybersecurity in violation of the FTCA and CFPA;

    g.   Failing to adhere to industry standards for cybersecurity as discussed above; and

    h.   Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

54. LCS negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

55.     Had LCS remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

56.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Class Members also lost the benefit of the bargain they made with LCS.

**G. LCS Should Have Known that Cybercriminals Target Private Information to Carry Out Fraud and Identity Theft**

57.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[7] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

58.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to

---

[7] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Jan. 8, 2024).

monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

59.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

60.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

61.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

62.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[8] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

63.      Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

64.     PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

---

[8] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Jan. 8, 2024).

65.     The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[9] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry.

66.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[10] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[11]

67.     Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker.  Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual.  It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to

[9] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited on Jan. 8, 2024).
[10] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/  (last visited on Jan. 8, 2024).
[11] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*:  https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited on Jan. 8, 2024).

threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[12]

68.    The Dark Web Price Index of 2022, published by PrivacyAffairs[13] shows how valuable just email addresses alone can be, even when not associated with a financial account:

| Email Database Dumps | Avg. Price USD (2022) |
|---|---|
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

69.    Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails.  If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

70.    Likewise, the value of PII is increasingly evident in our digital economy.  Many companies, including LCS, collect PII for purposes of business purposes such as data analytics and marketing. These companies collect it to better target customers and share it with third parties for similar purposes.[14]

71.    One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[15]

---

[12] *See* https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on Jan. 8, 2024).
[13] *See* https://www.privacyaffairs.com/dark-web-price-index-2022/ (last visited on Jan. 8, 2024).
[14] *See* https://robinhood.com/us/en/support/articles/privacy-policy/ (last visited on Jan. 8, 2024).
[15] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

72.     Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

73.     A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

74.     Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace.

75.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[16]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data [has] been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[16] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited Jan. 8, 2024).

76.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

77.     As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

H.  **Plaintiffs' and Class Members' Damages**

*Plaintiff David Lipps' Experience*

78.     Plaintiff David Lipps does not know how Defendant obtained his PII but, upon information and belief, LCS obtained Plaintiff's PII in the process of providing debt collection services to one of its financial institution clients.

79.     At the time of the Data Breach—on or around February 24, 2023—LCS retained Plaintiff's PII in its system.

80.     Plaintiff Lipps is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

81.     Plaintiff Lipps first learned of the Data Breach after receiving the Notice from LCS dated September 22, 2023, which notified him that his PII was improperly accessed and/or obtained by unauthorized third parties while in possession of Defendant, including his name and Social Security number.

82.     As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff Lipps made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach upon receiving the

Notice as well as contacting LCS to obtain more details about the Data Breach's occurrence. Plaintiff Lipps spent significant time dealing with the Data Breach – valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

83.     Plaintiff Lipps suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

84.     Plaintiff Lipps also suffered actual injury in the form of his PII being disseminated on the dark web, to which he was alerted by an Experian alert soon after the Data Breach.

85.     Plaintiff Lipps further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails which, upon information and belief, was caused by the Data Breach.

86.     The Data Breach has caused Plaintiff Lipps to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

87.     Plaintiff Lipps anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

88.     Plaintiff Lipps has a continuing interest in ensuring that his PII, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff Brandie Stifel's Experience*

89.     Upon information and belief, Plaintiff Stifel's Private Information came into Defendant's possession and control through one or more third parties that had direct privity with Plaintiff and which were clients of Defendant. Such Private Information was subsequently compromised as a result of the Data Breach, notice of which Defendant sent to her on or around September 22, 2023.

90.     Defendant obtained and continues to maintain Plaintiff Stifel's Private Information from at least one of its clients and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

91.     As a result of the data breach, Defendant exposed Plaintiff Stifel's Private Information for theft by cybercriminals and sale on the dark web.

92.     The Notice sent by Defendant to Plaintiff offered her only one year of credit monitoring services. One year of credit monitoring is not sufficient given that she will now experience a lifetime of increased risk of identity theft and other forms of targeted fraudulent misuse of her Private Information.

93.     Plaintiff Stifel suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and monitoring her accounts for fraud.

94.     Plaintiff Stifel suffered actual injury in the form of having her Private Information compromised and stolen as a result of the Data Breach.

95.     Plaintiff Stifel suffered actual injury in the form of damages to and diminution in the value of her Private Information, which was compromised in, and as a result of, the Data Breach.

96.     Plaintiff Stifel suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

97.     Plaintiff Stifel has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

98.     As a result of the Data Breach, Plaintiff Stifel made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to, researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant, as well as long-term credit monitoring options she will now need to use. Plaintiff Stifel has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

99.     As a result of the Data Breach, Plaintiff Stifel has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about

unauthorized parties viewing, selling, and using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Stifel is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

100.    Plaintiff Stifel also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendant, directly or indirectly, obtained from Plaintiff Stifel; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

101.    As a result of the Data Breach, Plaintiff Stifel anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

*Plaintiff Michael Weiler's Experience*

102.    Plaintiff Weiler has been subject to Defendant's debt collection practices, and, in the course of such practices, Defendant received highly sensitive information about Plaintiff Weiler, including but not limited to, his full name and Social Security number.

103.    On or about September 22, 2023, Plaintiff Weiler received a notification letter from Defendant stating that his Private Information was compromised by cybercriminals.

104.     As a result of the Data Breach, Plaintiff Weiler's Private Information has diminished in value.

105.    Plaintiff Weiler has faced and will continue to face a certain impending and substantial risk of future harms because of Defendant's ineffective data security measures, as further set forth herein.

*Plaintiff Larry Vaught's Experience*

106.    Plaintiff Vaught was unaware of Defendant's existence prior to receiving the letter, let along that LCS was collecting his Private Information, which is deeply troubling to him.

107.    Upon information and belief, LCS has Plaintiff Vaught's information from an unknown financial institution or other third-party client of LCS's, but the identity of this third party remains unknown to Plaintiff Vaught.

108.    Nevertheless, largely out of his control, Plaintiff Vaught's Private Information was among the data accessed by an unauthorized third-party in the Data Breach.

109.    Plaintiff Vaught received the Notice from Defendant on or around October 5, 2023, which stated that his PII was involved in the Data Breach.

110.    Plaintiff Vaught was unaware that the Data Breach had occurred, that LCS had his Private Information, or that LCS even existed, prior to receiving the letter.

111.    As a result, Plaintiff Vaught was injured in the form of lost time dealing with the consequences of the Data Breach, which included and continues to include: time spent verifying the legitimacy and impact of the Data Breach; time spent exploring credit monitoring and identity theft insurance options; time spent self- monitoring his accounts with heightened scrutiny and time spent seeking legal counsel regarding their options for remedying and/or mitigating the effects of the Data Breach.

112.    Plaintiff Vaught, in efforts to mitigate his damages and the resulting fallout from

the Data Breach he could not control, now checks his credit score every other day for 10 minutes at a time, and spends 45 minutes on his Saturdays logging onto all his identity and financial accounts to make sure everything is in line.

113.    Plaintiff Vaught was also injured by the material risk to future harm he suffers based on Defendant's breach; this risk is imminent and substantial because Plaintiff Vaught's data has been exposed in the Data Breach, including his Social Security number, which is highly sensitive and presents a high risk of identity theft or fraud; and it is likely, given Defendant's clientele, that some of the Class's information that has been exposed has already been misused.

114.    Plaintiff Vaught suffered actual injury in the form of damages to and diminution in the value of their PII—a condition of intangible property that he entrusted to Defendant, which was compromised in and as a result of the Data Breach.

115.    Plaintiff Vaught, as a result of the Data Breach, has increased anxiety for his loss of privacy and anxiety over the impact of cybercriminals accessing, using, and selling his PII.

116.    Plaintiff Vaught has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

117.    Plaintiff Vaught has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Common Injuries and Damages*

118.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals,

the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

### Data Breaches Increase an Individual's Risk of Identity Theft

119.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information, precisely as they have done here. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

120.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

121.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

manipulate and trick individuals into disclosing additional confidential or personal information
through means such as spam phone calls and text messages or phishing emails. Data Breaches can
be the starting point for these additional targeted attacks on the victims.

122.    One such example of criminals piecing together bits and pieces of compromised
PII for profit is the development of "Fullz" packages.[17]

123.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to
marry unregulated data available elsewhere to criminally stolen data with an astonishingly
complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

124.    The development of "Fullz" packages means here that the stolen Private
Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class
Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other
words, even if certain information such as emails, phone numbers, or credit card numbers may not
be included in the Private Information that was exfiltrated in the Data Breach, criminals may still
easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals
(such as illegal and scam telemarketers) over and over.

---

[17] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited
to, the name, address, credit card information, social security number, date of birth, and more. As a rule of
thumb, the more information you have on a victim, the more money that can be made off of those
credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per
record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various
ways, including performing bank transactions over the phone with the required authentication details in-
hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid,
can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the
victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a
compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale
in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),
https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-
insurance-firm/  (last visited on Jan. 8, 2023).

125.    The existence and prevalence of "Fullz" packages means that the Private Information stolen as a result of the Data Breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiffs and the other Class Members.

126.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

127.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### Loss Of Time to Mitigate The Risk Of Identity Theft And Fraud

128.    As a result of the recognized risk of identity theft, when a Data Breach occurs and an individual is notified by a company that their Private Information was compromised, as here, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

129.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as the Notice instructs, "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

130.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such researching and verifying the legitimacy of the Data Breach upon receiving the Notice as well as contacting LCS to obtain more details about the Data Breach's occurrence.

131.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[18]

132.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (including placing an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[19]

133.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[20]

---

[18] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[19] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).
[20] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Jan. 8, 2024) ("GAO Report").

### Diminution Of Value Of PII

134.    PII is a valuable property right.[21]  As set forth above, its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

135.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other entities in custody of healthcare and medical information often purchase PII on the black market for the purpose of target marketing their products and services to the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PII to adjust their insureds' medical insurance premiums.

136.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[22]

137.    An active and robust legitimate marketplace for PII exists. In 2021, the data brokering industry was worth roughly $200 billion.[23] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[24, 25] Consumers who agree to provide their web browsing history to the Nielsen Corporation can

---

[21] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[22] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Jan. 8, 2024).
[23] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[24] https://datacoup.com/
[25] https://digi.me/what-is-digime/

receive up to $50.00 a year.[26] Users of the personal data collection app Streamlytics can earn up to $200 a month by selling their personal information to marketing companies who use it to build consumer demographics profiles.[27]

138.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not by a price at which consumers themselves actually seek to sell it, but rather in the economic benefit consumers derive from being able to use it and control the use of it. For example, Plaintiffs and Class Members were only to obtain services from Defendant after providing it with their PII. A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit.

139.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

140.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached,

---

[26] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed Jan. 12, 2024)
[27] How To Sell Your Own Data And Why You May Want to, available at https://www.mic.com/impact/selling-personal-data-streamlytics (last accessed Jan. 12, 2024)

including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

141.    The fraudulent activity resulting from the Data Breach may not come to light for years.

142.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

143.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

### *Credit And Identity Theft Monitoring is Reasonable & Necessary*

144.    Given the type of targeted attack in this case, sophisticated criminal activity, the type of PII involved, the volume of PII obtained in the cyberattack, and Plaintiff's PII already being disseminated on the dark web (according to Experian), there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

145.    Such fraud may go undetected until debt collection calls (ironically, the very business LCS is engaged in) commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law

enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

146.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[28]

147.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

148.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

149.    Plaintiffs and Class Members also have an interest in ensuring that their Private Information, which is believed to still be in the possession of LCS, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

150.    As a direct and proximate result of LCS's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

---

[28] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited Jan. 8, 2024).

## V.    <u>CLASS ACTION ALLEGATIONS</u>

151.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

152.    Specifically, Plaintiffs propose the following Nationwide Class (referred to herein as the "Class"), subject to amendment as appropriate:

> **Nationwide Class**
>
> All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

153.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

154.    Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class, as well as to add subclasses before the Court determines whether certification is appropriate.

155.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

156.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands of customers of LCS's clients whose data was compromised in the Data Breach. The identities of Class Members are

ascertainable through LCS's records, Class Members' records, publication notice, self-identification, and other means.

157.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether LCS engaged in the conduct alleged herein;

    b.   When LCS learned of the Data Breach;

    c.   Whether LCS's response to the Data Breach was adequate;

    d.   Whether LCS unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

    e.   Whether LCS failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

    f.   Whether LCS's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    g.   Whether LCS's data security systems prior to and during the Data Breach were consistent with industry standards;

    h.   Whether LCS owed a duty to Class Members to safeguard their Private Information;

    i.   Whether LCS breached its duty to Class Members to safeguard their Private Information;

j.   Whether hackers obtained Class Members' Private Information via the Data Breach;

k.   Whether LCS had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

l.   Whether LCS breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

m.   Whether LCS knew or should have known that its data security systems and monitoring processes were deficient;

n.   What damages Plaintiffs and Class Members suffered as a result of LCS's misconduct;

o.   Whether LCS's conduct was negligent;

p.   Whether LCS's conduct was *per se* negligent;

q.   Whether LCS was unjustly enriched;

r.   Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.   Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

158.   Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

159.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

160.    <u>Predominance</u>. LCS has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from LCS's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

161.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for LCS. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

162.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). LCS has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief

and/or corresponding declaratory relief is appropriate as to the Class as a whole.

163.    Finally, all members of the proposed Class are readily ascertainable. LCS has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by LCS.

### VI.    CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
**(On behalf of Plaintiffs and the Class)**

164.    Plaintiffs restate and reallege all of the allegations stated above and hereafter as if fully set forth herein.

165.    LCS knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

166.    LCS's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

167.    LCS knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. LCS was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

168.    LCS owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. LCS's duties included, but were not limited to, the following:

    a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.    To protect Plaintiffs' and Class Members' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

    c.    To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

    d.    To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to the GLBA, CFPA, and FTCA;

    e.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    f.    To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

169.    LCS's duty to employ reasonable data security measures arose, in part, under the GLBA; the CFPA; and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170.    LCS's duty also arose because it was bound by industry standards to protect Plaintiffs' and Class Members' confidential Private Information.

171.    Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and LCS owed them a duty of care to not subject them to an unreasonable risk of harm.

172.    LCS, through its actions and omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within LCS's possession.

173.    LCS, by its actions and omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

174.    LCS, by its actions and omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

175.    LCS breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of its networks and systems;

c.    Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to comply with the GLBA; CFPA; FTCA; and

     f.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

176.    LCS acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

177.    LCS had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to allow LCS to come into possession of their Private Information was predicated on the understanding that such Private Information would be protected by implementation of adequate data security precautions. Moreover, only LCS had the ability to protect its systems (and the Private Information that it stored on them) from attack.

178.    LCS's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised and exfiltrated as alleged herein.

179.    LCS's breach of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

180.    As a result of LCS's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of criminal third parties and being sold on the dark web, will be used for fraudulent purposes.

181.    LCS also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

182.    As a direct and proximate result of LCS's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

183.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

184.    Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

185.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring LCS to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT II
### NEGLIGENCE *PER SE*
**(On behalf of Plaintiffs and the Class)**

186.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

187.    Pursuant to the GLBA, CFPA, and Section 5 of the FTCA, LCS had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

188.    LCS breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the GLBA, CFPA, and FTCA, including but not limited to proper

segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

189.    Plaintiffs and Class Members are within the class of persons that the GLBA, CFPA, and FTCA are intended to protect.

190.    The CFPA prohibits unfair acts or practices and the FTCA similarly prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of LCS's duty in this regard.

191.    LCS violated the GLBA, CFPA, and FTCA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

192.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to LCS's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

193.    LCS's violations of the GLBA, CFPA, and FTCA constitute negligence *per se*.

194.    Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to LCS's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

195.    As a direct and proximate result of LCS's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

196.    LCS breached its duties to Plaintiffs and the Class under the GLBA, CFPA, and FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

197.    As a direct and proximate result of LCS's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

198.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring LCS to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

<u>**COUNT III**</u>
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of the Plaintiffs and the Class)**

199.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

200.    Upon information and belief, Defendant entered into contracts to provide debt collection services to its clients, which services contemplated and required Defendant to implement adequate data security practices, procedures, and protocols sufficient to safeguard the

Private Information that was to be entrusted to it, including the Private Information belonging to Plaintiffs and Class Members.

201.    Upon information and belief, these contracts are virtually identical.

202.    These contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties.

203.    LCS knew that if it were to breach these contracts with its clients, Plaintiffs and the Class would be harmed.

204.    LCS breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach and, as a result, Plaintiffs and Class Members were negatively impacted as set forth herein.

205.    As foreseen, Plaintiffs and the Class were harmed by LCS's failure to use reasonable data security measures to store customer information, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

206.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

## COUNT IV
## INTRUSION UPON SECLUSION / INVASION OF PRIVACY
### (On behalf of Plaintiffs and the Class)

207.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

208.    Plaintiffs and Class Members maintain a privacy interest in their Private Information, which is private, confidential information that is also protected from disclosure by applicable laws set forth above.

209.    The State of Colorado recognizes the tort of Invasion of Privacy by Intrusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

210.    Plaintiffs and Class Members' Private Information was contained, stored, and managed electronically in LCS's records, computers, and databases that was intended to be secured from unauthorized access to third-parties because highly sensitive, confidential matters regarding Plaintiffs' and Class Members' identities were only shared with LCS for the limited purpose of LCS's clients obtaining and paying for Defendant's debt collection and other services.

211.    By collecting and intentionally failing to keep Plaintiffs' and the Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' right to seclusion in their private affairs and interfered with their private concerns.

212.    As a result of Defendant's knowing and willful failure to implement reasonable data security safeguards, it was substantially certain that Defendant's conduct would invade Plaintiffs' and Class Members' right to privacy and interfere with their private concerns.

213.    Defendant knew that ordinary persons in Plaintiffs' or Class Members' positions would consider this an invasion of privacy and Defendant's intentional actions highly offensive and objectionable.

214.    Defendant invaded Plaintiffs' and the Class Members' right to privacy and intruded into Plaintiffs' and the Class Members' private affairs by intentionally collecting, misusing, and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

215.    Defendant intentionally concealed from Plaintiffs and the Class Members an incident that misused and/or disclosed their PII without their informed, voluntary, affirmative, and clear consent.

216.    In failing to protect Plaintiffs' and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private.

217.    Plaintiffs and Class Members sustained damages (as outline above) as a direct and proximate consequence of the invasion of their privacy by intrusion, and therefore seek an award of damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

218.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

219.    Plaintiffs and Class Members conferred a benefit on LCS when their Private Information was turned over to Defendant.

220.    Upon information and belief, LCS funds its data security measures entirely from its general revenue, including from payments made to it by its clients that collected and shared with LCS the Private Information belonging to Plaintiffs and Class Members.

221.    As such, a portion of the payments made by Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to LCS.

222.    Defendant diverted funds intended to be put towards data security and instead applied them to its own profit at the expense of Plaintiffs and Class Members.

223.    LCS has retained the benefits of its unlawful conduct, including the amounts of payment received in rendering these services that should have been used for adequate cybersecurity practices that it failed to provide.

224.    LCS knew that Plaintiffs and Class Members conferred a benefit upon it, which LCS accepted. LCS profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

225.    If Class Members had known that LCS had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

226.    Due to LCS's conduct alleged herein, it would be unjust and inequitable under the circumstances for LCS to be permitted to retain the benefit of its wrongful conduct.

227.    As a direct and proximate result of LCS's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in LCS's possession and is subject to further unauthorized disclosures so long as LCS fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

228.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from LCS and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by LCS from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

229.     Plaintiffs and Class Members may not have an adequate remedy at law against LCS, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT VI
### DECLARATORY JUDGMENT/ INJUNCTIVE RELIEF
#### (On behalf of Plaintiffs and the Class)

230.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

231.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court also has broad authority to restrain acts, such as here, that are tortious and violate the terms of the regulations described in this Complaint.

232.     An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective duties to reasonably safeguard users' Private Information and whether Defendant is maintaining data security measures adequate to protect the Class Members, including Plaintiffs, from further data breaches that compromise their Private Information.

233.     Plaintiffs allege that Defendant's data-security measures remain inadequate. In addition, Plaintiffs and the Class continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information and fraudulent activity against them will occur in the future.

234.     Pursuant to its authority under the Declaratory Judgment Act, Plaintiffs request that the Court enter a judgment declaring, among other things, the following: (i) Defendant owes a duty to secure individuals' Private Information and to timely notify individuals of a data breach under

the common law and various federal and state statutes; and (ii) Defendant is in breach of these legal duties by failing to employ reasonable measures to secure individuals' Private Information in its possession and control.

235.    Plaintiffs further request that the Court issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect individuals' Private Information from future data breaches.

236.    If an injunction is not issued, the Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event Defendant experiences another data breach. The risk of another such breach is real, immediate, and substantial. If another breach of Defendant's systems occurs, the Class Members will not have an adequate remedy at law because many of the resulting injuries would not be readily quantifiable and Class Members will be forced to bring multiple lawsuits to rectify the same misconduct.

237.    The hardship to the Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if a similar data breach occurs again due to the repeated misconduct of Defendant, the Class Members will likely be subjected to substantial hacking and phishing attempts, fraud, and other instances of the misuse of their Private Information, in addition to the damages already suffered. On the other hand, the cost to Defendant of complying with an injunction by employing better and more reasonable prospective data security measures is relatively minimal, and Defendant has pre-existing legal obligations to employ such measures.

238.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing additional data breaches

suffered by Defendant, thus eliminating the additional injuries that would result to the Class Members and the individuals whose personal and confidential information would be further compromised.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a.  An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.  Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class, including the implementation and maintenance of reasonable security measures such as:

i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on LCS's systems on a periodic basis, and ordering LCS to promptly correct any problems or issues detected by such third-party security auditors;

ii.  engaging third-party security auditors and internal personnel to run automated security monitoring;

        iii.    auditing, testing, and training its security personnel regarding any new or modified procedures;

        iv.    segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of LCS's systems;

        v.    conducting regular database scanning and security checks;

        vi.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

        vii.    meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps LCS's customers should take to protect themselves.

d.    An order instructing LCS to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.    An order requiring LCS to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.    A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.    An award of such other and further relief as this Court may deem just and proper.

## VIII.    <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all triable issues.

DATED:  January 12, 2024.                    Respectfully submitted,

                                     */s/ Mason A. Barney*
                                     Mason A. Barney
                                     Tyler J. Bean
                                     **SIRI & GLIMSTAD LLP**
                                     745 Fifth Avenue, Suite 500
                                     New York, New York 10151
                                     Tel: (212) 532-1091
                                     E: mbarney@sirillp.com
                                     E: tbean@sirillp.com

                                     Gary M. Klinger
                                     **MILBERG COLEMAN BRYSON
                                     PHILLIPS GROSSMAN LLC**
                                     227 W. Monroe Street, Suite 2100
                                     Chicago, IL 60606
                                     Phone: (866) 252-0878
                                     E: gklinger@milberg.com

                                     *Interim Co-Lead Counsel for Plaintiffs and
                                     the Putative Class*

                                     Nicholas A. Migliaccio
                                     Jason S. Rathod
                                     **MIGLIACCIO & RATHOD LLP**
                                     412 H Street NE
                                     Washington, DC, 20002
                                     Office: (202) 470-3520
                                     E: nmigliaccio@classlawdc.com
                                     E: jrathod@classlawdc.com

                                     **LAUKAITIS LAW LLC**
                                     Kevin Laukaitis
                                     954 Avenida Ponce De Leon
                                     Suite 205, #10518
                                     San Juan, PR 00907

T: (215) 789-4462
E: klaukaitis@laukaitislaw.com

*Members of Plaintiffs' Executive Committee*